FILED
IN OPEN COURT

JUL 3 1 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:17-cr-052-01 (LMB) |
| | ) | |
| JOSE RIVERA, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

**Background**

1. The U.S. Department of State ("State Department") awarded the International Civilian Police ("CIVPOL") contract to Company A in or about February 2004. Company A was a prime contractor and the CIVPOL contract was a prime contract within the meaning of 41 U.S.C. § 8701.

2. On or about June 17, 2008, the State Department awarded to Company A a task order for the Iraq Civilian Advisor Support ("ICAS task order") under the CIVPOL contract. The work performed by Company A under the ICAS task order required Company A to employ personnel in Iraq.

3. By at least the early months of 2011, Company A learned that it needed to find real property to lease in Iraq to use in the performance of the ICAS task order.

4. Wesley Struble ("Struble") was an employee of Company B, another U.S.

Government contractor in Iraq, when he learned that Company A was looking for real property to lease in Iraq. Struble knew that Company B was leasing property from Company C, an Iraqi company, for approximately $124,000 per month.

5. Struble approached the defendant, Jose Rivera ("RIVERA"), a supervisory employee at Company A, to discuss with him whether Company A may be interested in leasing from Company C the real property then occupied by Company B. The real property was later known as Camp Butler II.

6. The lease of Camp Butler II by Company A from Company C became the subject of a conspiracy to violate Title 41, United States Code, Section 8702 (the Anti-Kickback Act).

### The Conspiracy

7. From at least in or about 2011, and continuing thereafter until at least through 2012, within the Eastern District of Virginia and elsewhere, RIVERA, Struble, Emil Popescu ("Popescu"), and others, including employees and affiliates of Company C, willfully conspired with one another to commit an offense against the United States, specifically, to violate the Anti-Kickback Statute, in violation of Title 41, United States Code, Section 8702, by:

  a. providing, offering to provide, soliciting, and accepting money to improperly obtain and reward favorable treatment in connection with the lease of Camp Butler II;

  b. including the amount of kickbacks in the contract price that Contractor C charged to Contractor A for the lease of Camp Butler II; and

  c. including the amount Contractor A charged to the State Department for payment of the leasing costs for Camp Butler II.

**Manner and Means of the Conspiracy**

8. It was a part of the conspiracy that employees and affiliates of Company C, would make Camp Butler II (or "the property") available to Company A at a substantially higher cost than that paid by the previous tenant, Company B.

9. It was further a part of the conspiracy that RIVERA, while employed by Company A, would, among other actions, attend meetings, review site requirements, and survey Camp Butler II, and then provide that information to Company A for its consideration when entering into the lease for Camp Butler II with Company C.

10. It was further a part of the conspiracy that employees and affiliates of Company C would make or cause to be made payments to RIVERA, Struble, Popescu and others, after receiving money from Company A for the lease of Camp Butler II.

11. It was further a part of the conspiracy that members of the conspiracy kept secret from others their respective roles in the conspiracy.

12. It was further a part of the conspiracy to use or attempt to use various methods of concealing the existence or true source of United States currency (cash) received by RIVERA and Struble as part of the kickback scheme including:

   a. the submission of a fictitious invoice from a third-party vendor associated with Struble to Company C for work never performed;

   b. the concealment of money sent to family members via United States mail;

   c. the concealment of money inside various electronic items, such as stereo speakers, that were then sent to family members via United States mail and commercial mail carriers;

3

    d.    the use of third parties to make payments towards the purchase of a motorcycle for RIVERA; and

    e.    the structuring of cash deposits to multiple financial institutions in amounts below a regulatory reporting threshold.

**Execution of the Conspiracy**

13. In or about May 2011, Struble departed employment with Company B. Not long thereafter, using RIVERA as a reference, Struble sought employment with Company A.

14. On or about June 17, 2011, employees and affiliates of Company C caused a letter to be delivered to Company B informing it that its lease was terminated and directing it to vacate the property by July 31, 2011.

15. Around this same time, in or about June and July 2011, Popescu left employment of Company B and began employment with Company C as its Operations Manager.

16. During the month of July 2011, RIVERA and Popescu were in Iraq. Struble, who had temporarily departed Iraq, regularly communicated via email with RIVERA and Popescu regarding the prospective lease of Butler II. In these email communications, RIVERA would ask questions and share information with Struble about the lease negotiations. During this timeframe, among other actions, RIVERA attended meetings, reviewed site requirements, and surveyed Camp Butler II. Company A relied upon this information when entering into the lease for Camp Bulter II with Company C.

17. On or about August 4, 2011, Struble traveled to Iraq through Washington-Dulles International Airport, within the Eastern District of Virginia, to begin performance of his employment for Company A.

18. On or about August 15, 2011, Struble drafted and sent by email to POPESCU a letter intended for COMPANY A that communicated a lease amount of $665,000 per month; POPESCU subsequently signed and submitted the letter to Company A on behalf of Company C.

19. In or about August 2011, responding to a question asked by a State Department contracting official, Company A transmitted false information from at least one member of the conspiracy to the State Department by reporting that it would be paying the same monthly lease rate to Company C as the amount previously paid by Company B for its lease of the property.

20. Relying upon that false information, and other information, the State Department approved the lease of the property by Company A and executed modifications under the ICAS task order authorizing payment for the cost of the lease.

21. On or about September 6, 2011, Company A executed a lease with Company C for Camp Butler II at a rate of $665,000 per month. The initial lease was for a period of September 2011 through March 2012. It was later extended, at the same rate, through the April of 2012.

22. For each month that Company A occupied and leased Camp Butler II, it received an invoice or combination of invoices from Company C for $665,000. The total amount of the invoices from September 2011 through April 2012 was approximately $5,320,000. Company A paid Company C for each of these invoices.

23. Company A included the costs of the lease of Camp Butler II in its monthly billings to the State Department under the ICAS task order. State Department reimbursed Company A a total of approximately $5,320,000 for the monthly lease of Camp Butler from Company C.

**Kickback Payments**

24. At least one of the bank accounts that Company C used to receive lease payments from Company A was controlled, in part, by Popescu.

25. From in or about September 2011 through in or about January 2012, Popescu and other employees and affiliates of Company C paid RIVERA and Struble periodic kickback payments totaling at least approximately $400,000.

26. From in or about September 2011 through in or about January 2012, RIVERA and Struble discussed with each other various methods of sending United States currency (cash) to the United States that they received as part of the kickback scheme.

27. In an effort to conceal the cash received from the kickback scheme, RIVERA and Struble carried some cash back to the United States with them on their persons. RIVERA and Struble also concealed some cash sent through the United States mail and commercial mail carriers, including inside electronic items, such as stereo speakers, that were shipped from Iraq to family members in the United States.

28. After the concealed cash was received by family members in the United States, and at the direction of RIVERA and Struble, deposits were made to accounts at various U.S. financial institutions in a manner to avoid regulatory reporting requirements.

29. In or about October and November 2011, RIVERA and Struble also worked together to cause Struble's family members to make payments towards the purchase of a motorcycle on behalf of RIVERA. To that end, RIVERA sent cash he received from the kickback scheme to one of Struble's family members in Missouri. In October and November 2011, Struble communicated with his family members on RIVERA's behalf. Using the cash

RIVERA sent to them from Iraq, Struble's family members purchased money orders and cashier's checks and made payments to a motorcycle dealer.

30. RIVERA left the employ of Company A in or about January 2012.

31. In or about March 2012, towards the end of the month, RIVERA and Struble flew to Amman, Jordan to meet with employees and associates of Company C with the intent to seek additional kickback payments they believed they were owed.

32. In or about April and May 2012, RIVERA and Struble exchanged emails asking cryptic questions of each other that were designed to discreetly ask whether either had learned about the likelihood of additional kickback payments they believed they were owed.

33. The kickback scheme was intended to and did cause the inflation of the cost of the Camp Butler II lease, which resulted in an approximate loss to the State Department of at least $3,466,125.20.

34. The acts taken by the defendant, JOSE RIVERA, in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____
Brian D. Harrison
Special Assistant United States Attorney (LT)

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Jose Rivera, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Jose Rivera

I am Jose Rivera's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Steven Webster, Esquire
Attorney for Jose Rivera